**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:21-cr-271 (EGS)** |
| **v.** | : | |
| | : | |
| **[2] DIANA SANTOS-SMITH,** | : | |
| | : | |
| **Defendant.** | : | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Diana Santos-Smith to a split sentence of fourteen days incarceration to be followed by three years' probation, sixty hours of community service, and $500 in restitution.

## I. INTRODUCTION

The defendant, Diana Santos-Smith, is a thirty-two-year-old house cleaner and former nurse's assistant who participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred law enforcement officers, and resulted in more than 2.7 million dollars in losses.[1]

On September 28, 2021, Diana Santos-Smith pleaded guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating, or Picketing in a Capitol Building. ECF Minute Entry entered September 28, 2021. As explained herein, a split sentence of incarceration and

---

[1] As of April 5, 2022, the approximate losses suffered because of the siege at the United States Capitol was $2,734,783.15. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

probation is appropriate in this case because (1) Santos-Smith and her co-defendant twice unlawfully entered into and remained inside of the Capitol via the Senate Wing Door breach point, an entrance that consists of one doorway flanked by two broken-out windows; (2) Santos-Smith's first breach occurred at 2:49 PM—just two minutes after the second breach of the Senate Wing Door (2:47 PM) and was via climbing through a broken-out window to the north of the door; (3) although Santos-Smith left the Capitol through the same window after only a few seconds, she made her way to the broken-out window just south of the Senate Wing Door and breached again just one minute later; (4) during her second breach, Santos-Smith remained inside the Capitol for just over one minute; and (5) after leaving the Capitol building, and while attempting to leave the congested Capitol grounds with her co-defendant, Santos-Smith appears in the background of a selfie-style video recorded by her co-defendant (GOV'T EXHIBIT 3), in which Bancroft mentions Diana by name and stated:

> **Diana and I** are on our way out but look at the way out. It's crazy. [laughs] This is the part I don't like because you can't breathe, you can't see, and if someone comes and was to drop a bomb, **we're** dead, basically. I know, right?
>
> But **we** broke into the Capitol. **We** got inside. **We** did our part. **We** were looking for Nancy to shoot her in the frickin' brain. But **we** didn't find her.
>
> But all is good.

Emphasis added. It appears that Santos-Smith laughs in the video when Bancroft says, "**We** were looking for Nancy to shoot her in the frickin' brain. But **we** didn't find her."

These aggravating factors and the totality of Santos-Smith's actions place her in the range of defendants for whom the government has recommended some form of confinement that is greater than home detention or straight probation. Specifically, the government does so here considering the double breach and the confrontation that Santos-Smith had with Probation when they attempted to complete an interview as part of their Presentence Investigation.

The government has no reason to believe that any evidence shows Santos-Smith personally engaging in violence or property destruction before, during, or after the riot. If such evidence existed, however, the government likely would have presented felony charges to a Grand Jury. The government does not believe that a defendant's failure to engage in violent or destructive acts is a mitigating factor in misdemeanor cases.

The government asks this Court to consider the reality that this defendant's conduct on January 6 took was part of a large and violent riot that desired to disrupt and succeeded in disrupting—albeit temporarily—Congress' certification of the Electoral College's vote. The rioters achieved their goal of breaching the Capitol in numerous locations—twice at the Senate Wing Door—and disrupting the certification proceedings due to the sheer number of rioters. While the exact number of rioters to attack the Capitol and breach its doors is not known at this time, the number was sufficient to overwhelm law enforcement and sully the nation's reputation for a peacefully transitioning power from one administration to the next.

Santos-Smith participated in a riot that succeeded in halting the Congressional certification of a Presidential election. Santos-Smith personally entered the Capitol twice, both times through a broken-out window and the first time within two minutes of the violent second breach of the Senate Wing Door. After leaving the Capitol, but while still on Capitol grounds, Santos-Smith saw her co-defendant recording a selfie-style video memorializing their conduct and claiming that she had done her part. Especially concerning is that Bancroft considered their part to be breaking into the Capitol, getting inside, looking for Nancy, and "shoot[ing] her in the frickin' brain." Santos-Smith reacts to this violent rhetoric involving her by laughing.

What Santos-Smith did on January 6, 2021, from her dual entry to her violent rhetoric renders a sentence of fourteen days incarceration, three years' probation, sixty hours of community

service, and $500 in restitution sufficient but not greater than necessary to achieve the purposes

set forth in 18 U.S.C. § 3553(a). The facts specific to Santos-Smith also show this Court why a

sentence of probation only or a sentence of home detention is insufficient.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

### a.    The January 6, 2021 Attack on the Capitol

For a general summary of the attack on the Capitol, the government relies on the paragraphs

1-7 of the previously filed Statement of Offense. ECF No. 35. As this Court knows, a riot cannot

occur without rioters, and each rioter's actions—from the most mundane to the most violent—

contributed to the violence and destruction of that day in both direct and indirect ways.

### b.    Diana Santos-Smith's Role in the January 6, 2021, Capitol Siege

On January 6, 2021, Diana Santos-Smith traveled to Washington, D.C., from her home in

Upper Black Eddy, Pennsylvania, to protest Congress' certification of the Electoral College. At

some point in the early afternoon, Santos-Smith walked with many other rioters to the Lower West

Plaza.[2] Below are screen shots from United States Capitol Police (USCP) video surveillance of the

West Front of the Capitol Building from approximately 2:39 PM[3] to approximately 2:48 PM, when

Santos-Smith was likely in the Northwest Plaza of the Capitol:

---

[2] The government encourages the Court to use GOV'T EXHIBIT 2, a map created by @ne0ndistraction and
@sansastark525 and publicly available at https://jan6attack.com/maps.htm, for bearings as the government references
various locations where Santos-Smith is known to have traveled.

[3] Times depicted in the screenshots are in Coordinated Universal Time, or the basis for civil time. In January, UTC is
seven hours ahead of Eastern Time, meaning that a UTC time of 19:00 is equivalent to an ET time of 14:00—or 2:00
PM.



*IMAGE 1*—*A screenshot from USCP surveillance showing the Inaugural Stage, the Upper West Plaza, and the Lower West Plaza at approximately 2:39 PM on January 6, 2021.*



*IMAGE 2*—*A screenshot from USCP surveillance showing the Inaugural Stage, the Lower West Plaza, and the West Lawn at approximately 2:45 PM on January 6, 2021.*



*IMAGE 3—A screenshot from USCP surveillance showing the NW Lawn and the NW Plaza at approximately 2:47 PM on January 6, 2021.*



*IMAGE 4—A screenshot from USCP surveillance showing the NW Plaza at approximately 2:48 PM on January 6, 2021.*





*IMAGE 5 and IMAGE 6—Screenshots from USCP surveillance showing the Senate Wing Door when the first breach was contained at approximately 2:27 PM (top) and when the second breach occurred at approximately 2:48 PM (bottom) on January 6, 2021.*

Santos-Smith is first captured on USCP surveillance climbing through the broken-out window just north of the Senate Wing Door. She is wearing a red-and-white brimmed cap with the words MAKE AMERICA GREAT AGAIN and a dark colored jacket with a red scarf with white dots. Santos-Smith quickly turns around and exits through the same window.





***IMAGE 7 and IMAGE 8****—Screenshots from USCP surveillance showing Diana Santos-Smith entering and exiting the Capitol for the first time through a broken-out window at approximately 2:50 PM on January 6, 2021.*

Santos-Smith's second entrance into the Capitol came just a minute or so later when she made her way to the broken-out window to the south of the Senate Wing Door. Santos-Smith appears to record a video with her cellphone while inside the Capitol. Soon after, and never having gone more than a few feet from the point of entry, she leaves.





**IMAGE 9 and IMAGE 10**—*Screenshots from USCP surveillance showing Diana Santos-Smith entering the Capitol for the second time through a broken-out window and recording a video at approximately 2:51 PM on January 6, 2021.*

After leaving the Capitol, Santos-Smith appears to remain in the NW Plaza for approximately twenty more minutes. She joins in a chant of "U-S-A! U-S-A!" and then walks away from the Capitol, stopping to thank various officers from the Metropolitan Police Department for their service.





***IMAGE 11 and IMAGE 12**—Screenshots from MPD body-worn cameras showing Diana Santos-Smith standing in a line with other rioters in the NW Plaza at 3:06 PM (top) and then walking away from the Capitol at 3:11 PM (bottom).*

It is while she was attempting to leave Capitol grounds that Bancroft recorded the video described above, calling Santos-Smith by name, and referring several times to what "we" did.



*IMAGE 13—A screenshot from the selfie-style video that Bancroft recorded while attempting to leave Capitol grounds and in which Santos-Smith appears.*

On January 12, 2021, the FBI received the aforementioned video from the Upper Dublin Police Department, who themselves had received it as part of an anonymous tip. On January 19, 2021, FBI agents interviewed Bancroft at her home in Doylestown, Pennsylvania. During the non-custodial interview, Bancroft admitted to her conduct, further stating that she and Santos-Smith traveled together at all times and in all places on January 6, 2021.

### c.   The Charges and Plea Agreement

On January 28, 2021, Santos-Smith was charged by complaint with violating 18 U.S.C. § 1752(a)(1), 18 U.S.C. § 1752(a)(2), 40 U.S.C. § 5104(e)(2)(D), and 40 U.S.C. § 5104(e)(2)(G). On January 29, 2021, the FBI arrested Santos-Smith in Fort Washington, Pennsylvania. On April 1, 2021, Santos-Smith was charged by four-count Information with 18 U.S.C. § 1752(a)(1), 18 U.S.C. § 1752(a)(2), 40 U.S.C. § 5104(e)(2)(D), and 40 U.S.C. § 5104(e)(2)(G). On September 28, 2021, Santos-Smith plead guilty to Count Four of the Information, charging her with a violation

of 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating, or Picketing in a Capitol Building. By plea agreement, Diana Santos-Smith agreed to pay $500 in restitution to the Department of the Treasury.

### d.  Statutory Penalties

The defendant now faces a sentencing on a single count of 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, the defendant faces up to six months of imprisonment and a fine of up to $5,000. The defendant must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

## III.    <u>Sentencing Factors Under 18 U.S.C. § 3553(a)</u>

In this misdemeanor case, 18 U.S.C. § 3553(a) guides the sentencing considerations and identifies the factors a court must consider in formulating the defendant's sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, all the Section 3553(a) factors weigh in favor of a sentence of fourteen days incarceration, three years' probation, sixty hours of community service, and $500 in restitution.

### a.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021 is a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms and was the one of the

only times in our history when the Capitol—the seat of our representative democracy—was occupied by hostile and violent rioters. By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on their individual conduct, as we now discuss, this Court should note that each person who entered the Capitol on January 6 without authorization did so under extreme circumstances. By the time they entered the Capitol, they—at a minimum—crossed through numerous barriers and barricades and heard the shouts and exclamations the mob. Depending on the timing and location of their approach, they also may have observed fighting with law enforcement officials and smelled chemical irritants in the air. No rioter was a "mere tourist" that day.

Additionally, while looking at the defendants' individual conduct, this Court, in determining a fair and just sentence on this spectrum, should look to a number of critical factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored commands from law enforcement officials; and (9) whether the defendant demonstrated  sincere remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each defendant on a spectrum as to their fair and just punishment. Had the defendant personally engaged in violence or destruction, he or she would be facing additional charges and/or penalties associated with that conduct. The absence of violent

or destructive acts on the part of the defendant is therefore not a mitigating factor in misdemeanor cases.

Santos-Smith arrived at the Capitol approaching, as many did, from the West after attending the former President's rally. She arrived at the Capitol later than many others, but in so doing, she would have seen a greater degree of violence and the signs of more violent and intense conflict. Many rioters commented on the smell of the chemical irritant lingering in the air. Many others participated in or at a minimum heard the chanting and violent rhetoric rippling throughout the crowd on the West Lawn. Images 1 through 4 above show that at around the time that Santos-Smith was making her way to the NW Plaza and the Senate Wing Door, hundreds of rioters were thronging the pathway that she would have necessarily trod to arrive there. As she admitted to the FBI, she was witness to the energy of that day, and can only seek to explain her behavior as having been caught up in it.

When she finally arrived at and entered the Capitol, it was within a minute of the second—and much more violent—breach of the Senate Wing Door. When Santos-Smith reached the Capitol, she did not attempt to enter by the door, but rather through a broken-out window. She left through the first window as quickly as she entered, only to go to the second broken-out window south of the Senate Wing Door and enter again. She left a short time later. Accordingly, the factors of whether, when, and how Santos-Smith entered the Capitol building weigh against her.

While the government does not have evidence that Santos-Smith encouraged violence, her co-defendant's exclamation—that *they* (a direct reference to Santos-Smith) had been looking for Nancy to shoot her in the frickin' brain—is among the most vile and graphic statements uttered by any rioter on Capitol grounds that day, including the more cryptic note left by Jacob Chansley in the Senate chamber ("It's only a matter of time, justice is coming"). The government has no

evidence to show that Santos-Smith entered the Capitol with the intent of finding the House Speaker and shooting her. Santos-Smith is not known to have encouraged others to engage in damaging the Capitol or other government property.

Santos-Smith's reaction to violence and destruction weighs against her, although it is perhaps a closer call. Once inside the Capitol, she claims that she turned back because of the crowd. The USCP surveillance bears this out, but it also shows her reentering, then joining in chants and mulling about in the NW Plaza for another twenty minutes or so after exiting. It seems that the main reason she and Bancroft finally left was to catch their 4:00 PM train back home, and not any kind of negative reaction to the violence and property destruction that they had witnessed. Santos-Smith's co-defendant Bancroft stated during her non-custodial interview to the FBI that she and Santos-Smith left when they realized they needed to catch their train. Santos-Smith is not known to have destroyed evidence. She turned the video that she filmed inside the Capitol over to the FBI.

Santos-Smith was in the Capitol for a brief period, and she was always within a few feet of the Senate Wing Door. (This analysis and perhaps the charges would be much different had she attempted to find the House Speaker's office or entered it, as many others did.). Further, outside of her pre-January 6 claims of election fraud, Santos-Smith has refrained from making statements in person or on social media after the fact that justify or excuse her actions. Santos-Smith also appears to have cooperated with commands from law enforcement officials while on Capitol grounds, and the government does not have any evidence to demonstrate that Santos-Smith's remorse or contrition is anything but sincere.

The government believes that its recommended sentence of fourteen days incarceration, three years' probation, sixty hours of community service, and $500 in restitution is sufficient but not greater than necessary to accomplish the sentencing goals established by statute.

### b. The History and Characteristics of the Defendant

As set forth in the Presentence Investigation Report, Diana Santos-Smith has no prior criminal history. She has no juvenile adjudications, adult criminal convictions, traffic infractions, excluded convictions, or other criminal conduct, pending charges, or arrests. Santos-Smith has lived in Newark, New Jersey; Allentown, Pennsylvania; and Upper Black Eddy, Pennsylvania. She has worked as a residential cleaner, a nurse's assistant, and a hospice aide. She has no physical disabilities or mental health concerns and does not appear to suffer from substance abuse issues.

There does appear to have been an incident with the US Probation Officer that attempted to conduct a home assessment, and a disagreement turned into Santos-Smith "los[ing] her composure" and "yell[ing] at the officer." ECF No. 46, p. 9. She also became fixated on explaining to the officer why she is not a criminal. Santos-Smith later apologized for her conduct, but this certainly weighs against sentencing Santos-Smith to straight probation or a period of home detention.

A split sentence of fourteen days incarceration, three years' probation, sixty hours of community service, and $500 in restitution is therefore appropriate. Having lived a law-abiding life for over half a century, Santos-Smith should have recognized the folly of her actions long before she arrived at the Capitol, and before she twice breached the Capitol.

### c. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the

democratic process."[4] As with the nature and circumstances of the offense, this factor supports a split sentence of fourteen days incarceration, three years' probation, sixty hours of community service, and $500 in restitution. as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually—should be expected") (statement of Judge Hogan).

### d.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

As applied to Santos-Smith, general deterrence weighs in favor of incarceration, as it does for nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. The violence at the Capitol on January 6 was cultivated to and did interfere with one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

---

[4] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021), available at https://oversight.house.gov/sites/democrats.oversight. house.gov/files/Wray%20Testimony.pdf

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70; *see United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37 ("As other judges on this court have recognized, democracy requires the cooperation of the citizenry. Protesting in the Capitol, in a manner that delays the certification of the election, throws our entire system of government into disarray, and it undermines the stability of our society. Future would-be rioters must be deterred.") (statement of Judge Nichols at sentencing).

The gravity of these offenses demands deterrence. This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

The government acknowledges that Santos-Smith has no convictions, arrests, or even traffic tickets, and that she accepted responsibility early by entering into this plea agreement. A sentence of only probation, however, is not justified in this case given Santos-Smith's violent rhetoric on Capitol grounds directed at a member of Congress. This is especially true given her proximity to violent individuals and presence near the front line of the rioters during the violent second breach of the Senate Wing Door. The government believes that a split sentence of fourteen

days incarceration, three years' probation, sixty hours of community service, and $500 in restitution satisfies the need for specific deterrence.

### e.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this assault on the Capitol, ranging from misdemeanor charges (such as in this case), to charges of assault on law enforcement officers and conspiracy to corruptly interfere with Congress.[5] Certainly each offender must be sentenced based on their individual circumstances, but this Court should always keep the backdrop of the January 6 riot in mind. Moreover, each offender's case will exist on a spectrum that ranges from conduct meriting a term of home detention—or exceedingly rarely, probation only—to crimes necessitating years of imprisonment. The misdemeanor defendants will generally fall on the lower end of that spectrum, but misdemeanor breaches of the Capitol on January 6, 2021, *were not* minor crimes. A probationary sentence should not become the default.[6] As Judge Lamberth stated, "I don't want to create the impression that probation is the automatic outcome here because it's not going to be." *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164 (RCL), Tr. 6/23/2021 at 19; *see also United States v. Valerie Ehrke*, 1:21-cr-00097 (PFF), Tr. 9/17/2021 at 13 ("Judge Lamberth said something to the effect . . . 'I don't want to create the impression that probation is the automatic outcome here, because it's not

---

[5] Attached to this supplemental sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants. That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

[6] Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation, including in *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164(RCL); *United States v. Valerie Elaine Ehrke*, 1:21-cr-00097(PFF); and *United States v. Donna Sue Bissey*, 1:21-cr-00165(TSC). The government is abiding by its agreements in those cases, but has made no such agreement in this case. *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

going to be.' And I agree with that. Judge Hogan said something similar.") (statement of Judge Friedman).

The government and the sentencing courts have drawn meaningful distinctions between offenders. Those who engaged in felonious conduct are generally more dangerous, and thus, treated more severely in terms of their conduct and subsequent punishment. Those who trespassed, but engaged in aggravating factors, merit serious consideration of institutional incarceration. Those who trespassed, but engaged in less serious aggravating factors, deserve a sentence more in line with minor incarceration or home detention.

Santos-Smith plead guilty to Count Four of the Information, charging her with parading, demonstrating, or picketing in a Capitol Building, a violation of 40 U.S.C. § 5104(e)(2)(G). This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A. § 3553(6), do apply, however.

For one thing, although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many considerations help in understanding the differing recommendations and sentences. These considerations include those discussed above, including how a defendant entered the Capitol, how long they remained inside, the nature of any statements they made (on social media or otherwise), whether they destroyed evidence of his participation in the breach, etc. And as that discussion illustrates, avoiding unwarranted disparities requires the courts to consider not only a defendant's "records" and "conduct" but other relevant sentencing criteria, such as a defendant's expression of remorse or cooperation with law enforcement. *See*

*United States v. Hemphill*, 514 F.3d 1350, 1365 (D.C. Cir. 2008) (no unwarranted disparity regarding lower sentence of codefendant who, unlike defendant, pleaded guilty and cooperated with the government).

Even in Guidelines cases, sentencing courts are permitted to consider sentences imposed on co-defendants in assessing disparity. *E.g., United States v. Knight*, 824 F.3d 1105, 1111 (D.C. Cir. 2016); *United States v. Mejia*, 597 F.3d 1329, 1343-44 (D.C. Cir. 2010); *United States v. Bras*, 483 F.3d 103, 114 (D.C. Cir. 2007). The Capitol breach was *sui generis*: a mass crime with significant distinguishing features, including the historic assault on the seat of the legislative branch of the federal government, the vast size of the mob, the goal of impeding if not preventing the peaceful transfer of Presidential power, the use of violence by a substantial number of rioters against law enforcement officials, and the large number of victims. Thus, even though many of the defendants were not charged as conspirators or as codefendants, the sentences handed down for Capitol breach offenses is an appropriate group for purposes of measuring disparity of any future sentence.

The sentences imposed in previously sentenced cases involving the events of January 6 demonstrate that a probation-only sentence in this case would create a disparity with others. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the Court government suggests that the Court consider the sentence imposed by Your Honor in *U.S. v. James Bonet*, 21-CR-121 (EGS). There, the defendant entered the Capitol at 3:09 PM and boasted about it. He entered Senator Merkley's flyaway office and while inside, he smoked marijuana. He was sentenced to three months' incarceration, three months' probation, 200 hours' community service, and ordered to pay $500 restitution.

In *U.S. v. Daniel Herendeen*, 21-CR-278-2 (BAH), the defendant also entered through the Senate Wing Door. While inside the Capitol, Herendeen recorded a video stating, referring to members of Congress, "They're in the basement, we need to go to the basement." Similar to Santos-Smith, Herendeen never went to the basement or otherwise physically directed others to go to the basement of the Capitol. The Chief Judge imposed a sentence of fourteen days intermittent incarceration, two months' home detention, and thirty-six months' probation.

In *U.S. v. Sorvisto*, 21-CR-320 (ABJ), the defendant entered through the Senate Wing Door, and for approximately twenty-five minutes, he and a co-defendant intruded into several areas of the Capitol, taking selfies along the way. Judge Berman Jackson sentenced Sorvisto to thirty days of incarceration.

In *U.S. v. Oliver Sarko*, 21-CR-591 (CKK), the defendant entered through the Senate Wing Door during its second breach, just as Santos-Smith did. Sarko, like Bancroft, recorded videos of himself shouting "Bring out Pelosi!" and "Where are the traitors?" He celebrated his entry into the Capitol after seeing grounded barricades and smelling tear gas. Sarko, like Santos-Smith, heard the alarms blaring throughout the building, but despite all the visual and audible signs that he and the mob were not authorized to be inside of the Capitol, he entered and remained inside. Sarko received a sentence of thirty days incarceration split with thirty-six months' probation.

In *U.S. v.Frank J. Scavo*, 21-CR-254 (RCL), the defendant entered the Capitol through the East Rotunda Door. Like Santos-Smith, Scavo arrived at a breach point when there were obvios signs of violence and property damage. Nonetheless, Scavo pushed through the East Rotunda Door, just as Santos-Smith pushed in through the broken-out windows of the Senate Wing Door. Scavo was also only in the Capitol for a relatively brief time, from 2:40 PM to 2:50 PM, and while

inside he took selfies and recorded video of himself. Judge Lamberth sentenced the defendant to sixty days of incarceration.

The task of balancing sentences of the Capitol riots defendants is difficult, and that difficulty will only increase as the number of guilty pleas grows. At least one thing is clear: Santos-Smith should *not* receive a sentence of probation or home detention only.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## IV.  As This Court Has Previously Recognized, It Has Authority To Impose The Government's Recommended Split Sentence of A Term Of Incarceration To Be Followed By A Term Of Probation In This Case.

A sentencing court may impose a "split sentence"—"a period of incarceration followed by period of probation," *Foster v. Wainwright*, 820 F. Supp. 2d 36, 37 n.2 (D.D.C. 2011) (citation omitted)—for a defendant convicted of a federal petty offense.  See *See* 18 U.S.C. § 3561(a)(3); *see United States v. Little*, 21-cr-315 (RCL), 2022 WL 768685, at *1 (D.D.C. Mar. 14, 2022) (concluding that " a split sentence is permissible under law and warranted by the circumstances of

this case); *United States v. Sarko*, No. 21CR591 (CKK), 2022 WL 1288435, at *1 (D.D.C. Apr. 29, 2022) (explaining why a split sentence is permissible in a petty offense case); *United States v. Caplinger*, No. CR 21-0342 (PLF), 2022 WL 2045373, at *1 (D.D.C. June 7, 2022) ("the Court concludes that a split sentence is permissible for a petty offense and therefore is an option for the Court in Mr. Caplinger's case."); *United States v. Smith*, 21-cr-290 (RBW), ECF 43 (D.D.C. Mar. 15, 2022) (imposing split sentence); *United States v. Meteer*, 21-cr-630 (CJN), ECF 37 (D.D.C. April 22, 2022) (imposing split sentence); *United States v. Entrekin*, 21-cr-686 (FYP), ECF 34 (D.D.C. May 6, 2022) (imposing split sentence); *United States v. Hemphill*, 21-cr-555 (RCL), ECF 42 (D.D.C. May 24, 2022) (imposing split sentence); *United States v. Buhler*, 21-cr-510 (CKK), ECF 39 (D.D.C. June 1, 2022) (imposing split sentence); *United States v. Revlett*, 21-cr-281 (JEB), ECF 46, (D.D.C. July 7, 2022) (imposing split sentence); *United States v. Getsinger*, 21-cr-607 (EGS), ECF Minute Entry (D.D.C. July 12, 2022) (imposing split sentences); *United States v. Blakely*, 21-cr-00356 (EGS), ECF Minute Entry (D.D.C. July 14, 2022); *United States v. Ticas*, 21-cr-00601 (JDB), ECF Minute Entry (D.D.C. July 15, 2022). In addition, for any defendant placed on probation, a sentencing court may impose incarceration for a brief interval as a condition of probation under 18 U.S.C. § 3563(b)(10).

### A.  *Relevant Background*

In 1984, Congress enacted the Sentencing Reform Act, which in substantial part remains the sentencing regime that exists today.  *See* Pub. L. No. 98–473, §§211-212, 98 Stat 1837 (1984), *codified at* 18 U.S.C. § 3551 *et seq.*; *see Mistretta v. United States*, 488 U.S. 361, 365-66 (1989) (noting that the Sentencing Reform Act of 1984 wrought "sweeping changes" to federal criminal sentencing).  That legislation falls in Chapter 227 of Title 18, which covers "Sentences."  Chapter 227, in turn, consists of subchapter A ("General Provisions"), subchapter B ("Probation"),

subchapter C ("Fines"), and subchapter D ("Imprisonment).   Two provisions—one from subchapter A and one from subchapter B—are relevant to the question of whether a sentencing court may impose a term of continuous incarceration that exceeds two weeks[7] followed by a term of probation.

First, in subchapter A, 18 U.S.C. § 3551 sets out "[a]uthorized sentences."  Section 3551(a) makes clear that a "defendant who has been found guilty of" any federal offense "shall be sentenced in accordance with the provisions of" Chapter 227 "[e]xcept as otherwise specifically provided."  18 U.S.C. § 3551(a).  Section 3551(b) provides that a federal defendant shall be sentenced to "(1) a term of probation as authorized by subchapter B; (2) a fine as authorized by subchapter C; or (3) a term of imprisonment as authorized by subchapter D."  18 U.S.C. § 3551(b).[8] As a general matter, therefore, "a judge must sentence a federal offender to either a fine, a term of probation, or a term of imprisonment."  *United States v. Kopp*, 922 F.3d 337, 340 (7th Cir. 2019).

Second, 18 U.S.C. § 3561, the first provision in subchapter B, addresses a "[s]entence of probation."  As initially enacted, Section 3561 provided that a federal defendant may be sentenced to a term of probation "unless . . . (1) the offense is a Class A or Class B felony and the defendant is an individual; (2) the offense is an offense for which probation has been expressly precluded; or (3) the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense."  Pub. L. No. 98-473, at § 212; *see United States v. Anderson*, 787 F. Supp. 537, 539 (D. Md. 1992) (noting that the Sentencing Reform Act did not permit "a period of 'straight' imprisonment . . . at the same time as a sentence of probation").

---

[7] A period of incarceration that does not exceed two weeks followed by a term of probation is also permissible under 18 U.S.C. § 3653(b)(10). *See* Part II *infra*.

[8] Section 3551(b) further provides that a sentencing judge may impose a fine "in addition to any other sentence."  18 U.S.C. § 3551(b).

Congress, however, subsequently amended Section 3561(a)(3). In 1991, Congress considered adding the following sentence to the end of Section 3561(a)(3): "However, this paragraph does not preclude the imposition of a sentence to a term of probation for a petty offense if the defendant has been sentenced to a term of imprisonment at the same time for another such offense." H.R. Rep. 102-405, at 167 (1991). Instead, three years later Congress revised Section 3561(a)(3) by appending the phrase "that is not a petty offense" to the end of the then-existing language. *See* H.R. Rep. No. 103-711, at 887 (1994) (Conference Report). In its current form, therefore, Section 3561(a)(3) provides that a defendant "may be sentenced to a term of probation unless . . . the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense." 18 U.S.C. § 3561(a)(3).

### B. Analysis

Before Congress passed the Sentencing Reform Act of 1984, sentencing courts could impose a split sentence on a federal defendant in certain cases. *See United States v. Cohen*, 617 F.2d 56, 59 (4th Cir. 1980) (noting that a sentencing statute enacted in 1958 had as its "primary purpose . . . to enable a judge to impose a short sentence, not exceeding sixth months, followed by probation on a one count indictment"); *see also United States v. Entrekin*, 675 F.2d 759, 760-61 (5th Cir. 1982) (affirming a split sentence of six months' incarceration followed by three years of probation). In passing the Sentencing Reform Act, Congress sought generally to abolish the practice of splitting a sentence between imprisonment and probation because "the same result" could be accomplished through a "more direct and logically consistent route," namely the use of supervised release as set out in 18 U.S.C. §§ 3581 and 3583. S. Rep. No. 225, 1983 WL 25404, at *89; *accord* United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") § 5B1.1,

Background.  But Congress's 1994 amendment to Section 3561(a)(3) reinstated a sentencing court's authority to impose a split sentence for a petty offense.

Under 18 U.S.C. § 3561, a defendant "may be sentenced to a term of probation unless . . . the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense."  18 U.S.C. § 3561(a)(3).  Thus, for any federal offense *other than* a petty offense, Section 3561(a)(3) prohibits "imposition of both probation and straight imprisonment," consistent with the general rule in Section 3551(b).  *United States v. Forbes*, 172 F.3d 675, 676 (9th Cir. 1999); *see United States v. Martin*, 363 F.3d 25, 31 (1st Cir. 2004); *United States v. Harris*, 611 F. App'x 480, 481 (9th Cir. 2015); *Anderson*, 787 F. Supp. at 539.

But the statutory text of 18 U.S.C. § 3561(a)(3) goes further by permitting a court to sentence a defendant to a term of probation "unless" that defendant "is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense."  18 U.S.C. § 3561(a)(3).  Section 3561 "begins with a grant of authority"—permitting a court to impose probation—followed by a limitation in the words following "unless."  *Little*, 2022 WL 768685, at *4.  But that limitation "does not extend" to a defendant sentenced to a petty offense. *See id.* ("[W]hile a defendant's sentence of a term of imprisonment *may* affect a court's ability to impose probation, the petty-offense clause limits this exception.").

It follows that when a defendant *is* sentenced for a petty offense, that defendant may be sentenced to a period of continuous incarceration and a term of probation.  *See United States v. Posley*, 351 F. App'x 807, 809 (4th Cir. 2009) (per curiam).  In *Posley*, the defendant, convicted of a petty offense, was sentenced to two years of probation with the first six months in prison.  *Id.* at 808.  In affirming that sentence, the Fourth Circuit concluded that Section 3561(a)(3) "[u]nquestionably" provided statutory authority to sentence the petty-offense defendant to "a term

of six months of continuous imprisonment plus probation." *Id.* at 809; *see* Cyclopedia of Federal Procedure, § 50:203, *Capacity of court to impose probationary sentence on defendant in conjunction with other sentence that imposes term of imprisonment* (3d ed. 2021) ("[W]here the defendant is being sentenced for a petty offense, a trial court may properly sentence such individual to a term of continuous imprisonment for a period of time, as well as a sentence of probation.") (citing *Posley*); *see also* Wright and Miller, *Federal Practice and Procedure*, § 547, at n.13 (4th ed. 2021) ("A defendant may be sentenced to probation unless he . . . is sentenced at the same time to imprisonment for an offense *that is not petty*.") (emphasis added).

Nor does the phrase "that is not a petty offense" in Section 3561(a)(3) modify only "different offense." *See Little*, 2022 WL 768685, at *5-*6 (concluding that "same" in Section 3561(a)(3) functions as an adjective that modifies "offense"). Section 3561(a)(3) does not state "the same *offense* or a different offense that is not a petty offense," which would imply that the final modifier—*i.e.*, "that is not a petty offense"—applies only to "different offense." The phrase "that is not a petty offense" is a postpositive modifier best read to apply to the entire, integrated phrase "the same or a different offense." *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 148 (2012). Had Congress sought to apply the phrase "not a petty offense" solely to "different offense," the "typical way in which syntax would suggest no carryover modification" would be some language that "cut[s] off the modifying phrase so its backward reach is limited." *Id.* at 148-49. And while the indefinite article "a" might play that role in other contexts (*e.g.*, "either a pastry or cake with icing" vs. "either a pastry or a cake with icing"), the indefinite article in Section 3561(a)(3) merely reflects the fact that the definite article before "same" could not naturally apply to the undefined "different offense." *See Little*, 2022 WL

768685, at *6 (identifying other statutes and "legal contexts" with the identical phrase that carry the same interpretation).

Permitting a combined sentence of continuous incarceration and probation for petty offenses is sensible because sentencing courts cannot impose supervised release on petty-offense defendants. *See* 18 U.S.C. § 3583(b)(3); *United States v. Jourdain*, 26 F.3d 127, 1994 WL 209914, at *1 (8th Cir. 1994) (unpublished) (plain error to impose a term of supervised release for a petty offense). When Congress in 1994 amended the language in Section 3561(a), it again provided sentencing courts with "latitude," *see* S. Rep. 98-225, 1983 WL 25404, at *89, to ensure some degree of supervision—through probation—following incarceration.

Section 3551(b)'s general rule that a sentencing court may impose either imprisonment or probation (but not both) does not preclude a sentencing court from imposing a split sentence under Section 3561(a)(3) for a petty offense for two related reasons.

First, the more specific permission for split sentences in petty offense cases in Section 3561(a)(3) prevails over the general prohibition on split sentences in Section 3551(b). *See Morton v. Mancari*, 417 U.S. 535, 550-51 (1974) ("Where there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one."). As noted above, when Congress enacted the general prohibition on split sentences in Section 3551(b), it had not yet enacted the more specific carveout for split sentences in petty offense cases in Section 3561(a)(3). That carveout does not "void" the general prohibition on split sentences in Section 3551(b); rather, Section 3551(b)'s general prohibition's "application to cases covered by the specific provision [in Section 3651(a)(3)] is suspended" as to petty offense cases. Scalia & Garner, *supra*, at 184. In other words, Section 3551(b)'s prohibition against split sentences "govern[s] all other cases" apart

from a case involving a petty offense. *Id.* This interpretation, moreover, "ensures that *all* of Congress's goals set forth in the text are implemented." *Little*, 2022 WL 768685, at *8.

Second, to the extent Section 3551(b)'s general prohibition against split sentences conflicts with Section 3561(a)(3)'s permission for split sentences in petty offense cases, the latter, later-enacted provision controls. *See Posadas v. Nat'l Bank of N.Y.*, 296 U.S. 497, 503 (1936) ("Where provisions in the two acts are in irreconcilable conflict, the later act to the extent of the conflict constitutes an implied repeal of the earlier one."); Scalia & Garner, *supra*, at 327-329. Where a conflict exists "between a general provision and a specific one, whichever was enacted later might be thought to prevail." *Id.* at 185. "The "specific provision"—here Section 3561(a)(3)—"does not negate the general one entirely, but only in its application to the situation that the specific provision covers." *Id.* Section 3551(b)'s general prohibition does not operate against the more specific, later-enacted carveout for split sentences in Section 3561(a)(3).

An interpretation of Sections 3551(b) and 3561(a) that a sentencing court "must choose between probation and imprisonment when imposing a sentence for a petty offense," *United States v. Spencer*, No. 21-cr-147 (CKK), Doc. 70, at 5 (Jan. 19, 2022), fails to accord the phrase "that is not a petty offense" in Section 3561(a)(3) any meaning. When Congress in 1994 amended Section 3561(a)(3) to include that phrase, it specifically permitted a sentencing court in a petty offense case to deviate from the otherwise applicable general prohibition on combining continuous incarceration and probation in a single sentence. Ignoring that amended language would improperly fail to "give effect to every clause and word" of Section 3561(a)(3). *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 385 (2013).

Congress's unenacted language from 1991 does not suggest that a split sentence is available only where a defendant is sentenced at the same time for two different petty offenses or for two

offenses, at least one of which is a petty offense.  For one thing, the Supreme Court has regularly rejected arguments based on unenacted legislation given the difficulty of determining whether a prior bill prompted objections because it went too far or not far enough.  *See Mead Corp. v. Tilley*, 490 U.S. 714, 723 (1989) ("We do not attach decisive significance to the unexplained disappearance of one word from an unenacted bill because 'mute intermediate legislative maneuvers' are not reliable indicators of congressional intent.") (citation omitted).  Moreover, under that view, every offense other than a petty offense could include some period of incarceration and some period of supervision (whether that supervision is supervised release or probation).  Yet so long as a defendant was convicted of two petty offenses, that defendant could be sentenced to incarceration and supervision (in the form of probation).  No sensible penal policy supports that interpretation.

It follows that a sentencing court may impose a combined sentence of incarceration and probation where, as here, the defendant is convicted of a petty offense.  Dawn Lee Bancroft pleaded guilty to one count of 40 U.S.C. § 5104(e)(2)(G): Parading, Demonstrating, or Picketing in the Capitol Building, which is a "petty offense" that carries a maximum penalty that does not exceed six months in prison and a $5,000 fine.  *See* 18 U.S.C. § 19; *see United States v. Soderna*, 82 F.3d 1370, 1381 n.2 (7th Cir. 1996) (Kanne, J., concurring) (citations omitted) (noting that a petty offender may face a sentence of up to five years in probation).

### C.  A sentence of probation may include incarceration as a condition of probation, though logistical and practical reasons may militate against such a sentence during an ongoing pandemic.

In 18 U.S.C. § 3563, Congress set out "[c]onditions of probation."  18 U.S.C. § 3563.  Among the discretionary conditions of probation a sentencing court may impose is a requirement that a defendant

> remain in the custody of the Bureau of Prisons during nights, weekends or other intervals of time, totaling no more than the lesser of one year or the term of imprisonment authorized for the offense, during the first year of the term of probation or supervised release.

18 U.S.C. § 3563(b)(10).  Congress enacted this provision to give sentencing courts "flexibility" to impose incarceration as a condition of probation in one of two ways.  S. Rep. No. 225, 1983 WL 25404, at *98.  First, a court can direct that a defendant be confined in "split intervals" over weekends or at night.  *Id.*  Second, a sentencing court can impose "a brief period of confinement" such as "for a week or two."  *Id.*[9]

A sentencing court may impose one or more intervals of imprisonment up to a year (or the statutory maximum) as a condition of probation, so long as the imprisonment occurs during "nights, weekends or other intervals of time."  18 U.S.C. § 3653(b)(10).  Although the statute does not define an "interval of time," limited case law suggests that it should amount to a "brief period" of no more than a "week or two" at a time.  *United States v. Mize*, No. 97-40059, 1998 WL 160862, at *2 (D. Kan. Mar. 18, 1998) (quoting Section 3563(b)(10)'s legislative history described above and reversing magistrate's sentence that included 30-day period of confinement as a condition of probation); *accord United States v. Baca*, No. 11-1, 2011 WL 1045104, at *2 (C.D. Cal. Mar. 18, 2011) (concluding that two 45-day periods of continuous incarceration as a condition of probation was inconsistent with Section 3563(b)(10)); *see also Anderson*, 787 F. Supp. at 538 (continuous 60-day incarceration not appropriate as a condition of probation); *Forbes*, 172 F.3d at 676 ("[S]ix months is not the intermittent incarceration that this statute permits.").  Accordingly, a sentence of

---

[9] Section 3563(b)(10)'s legislative history notes that imprisonment as a term of probation was "not intended to carry forward the split sentence provided in Section 3561, by which the judge imposes a sentence of a few months in prison followed by probation."  S. Rep. No. 225, 1983 WL 25404, at *98.

up to two weeks' imprisonment served in one continuous term followed by a period of probation is permissible under Section 3563(b)(10).[10]

A sentencing court may also impose "intermittent" confinement as a condition of probation to be served in multiple intervals during a defendant's first year on probation.  18 U.S.C. § 3563(b)(10); *see Anderson*, 787 F. Supp. at 539.  Notwithstanding a sentencing court's legal authority to impose intermittent confinement in this manner, the government has refrained from requesting such a sentence in Capitol breach cases given the potential practical and logistical concerns involved when an individual repeatedly enters and leaves a detention facility during an ongoing global pandemic.  Those concerns would diminish if conditions improve or if a given facility is able to accommodate multiple entries and exits without unnecessary risk of exposure.

[THIS SPACE INTENTIONALLY LEFT BLANK]

---

[10] Section 3563(b)(10)'s use of the plural to refer to "nights, weekends, or intervals of time" does not imply that a defendant must serve multiple stints in prison. Just as "words importing the singular include and apply to several persons, parties, or things," "words importing the plural include the singular."  1 U.S.C. § 1; *see* Scalia & Garner, *supra*, at 129-31.

## IV.    <u>**Conclusion**</u>

Sentencing requires the Court to carefully balance the § 3553(a) factors. As explained herein, some of those factors support a sentence of incarceration and some support a more lenient sentence. Balancing these factors, the government recommends that this Court sentence Diana Santos-Smith to a split sentence of fourteen days incarceration to be followed by three years' probation, sixty hours of community service, and $500 in restitution. This sentence will serve to protect the community, promote respect for the law, and deter future crime by imposing restrictions on her liberty because of her behavior, while recognizing her early acceptance of responsibility.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

By: _____
SEAN P. MURPHY
Assistant United States Attorney
D.C. Bar No. 1187821
Torre Chardon, Suite 1201
350 Carlos Chardon Ave.
San Juan, PR 00918
787-766-5656
sean.murphy@usdoj.gov